*FILED*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

03 JUL 22 PM 2: 51

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SARAH ELIZABETH HOOD, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ]   CV-02-CO-1842-E |
| | ] |
| ITC DELTACOM COMMUNICATIONS, | ] |
| INC., | ] |
| | ] |
| Defendant(s). | ] |



**ENTERED**

JUL 2 2 2003

### MEMORANDUM OF OPINION

## I.   INTRODUCTION.

Presently before the court is a motion for summary judgment, filed by the defendant on June 2, 2003. [Doc. # 38.] The issues raised therein have been fully briefed by both parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion is due to be granted in all respects.

## II.   FACTS.[1]

### A.   Introduction.

The plaintiff, Sarah Hood ("Ms. Hood"), who suffers from bipolar disorder and attention deficit disorder ("ADD"), began working as a telephone call operator for the defendant, ITC Deltacom Communications, Inc., ("ITC") at its Anniston, Alabama,

---

[1]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



facility in June 2000. At all times relevant to this action, Ms. Hood resided in Centre, Alabama, which is approximately fifty miles from ITC's Anniston facility. During her initial orientation at ITC, Ms. Hood was given the opportunity to identify herself as an individual with a disability by filling out a form entitled "Invitation for Inclusion under the Affirmative Action Programs for Veterans and Individuals with Disabilities." (Hood Dep. Ex. 5.) Ms. Hood did so, and she also completed an identification card listing her conditions and current medications. Additionally, Ms. Hood informed her supervisor, Nita Keeble ("Ms. Keeble"), that she suffered from bipolar disorder.

Ms. Hood testified in her deposition about the effects her bipolar disorder has on her; she stated that it affects her concentration, causes anxiety, and has adversely affected her social life. However, Ms. Hood admitted that during her employment with ITC, her bipolar disorder did not prohibit her from performing any of her job functions. Ms. Hood also claims that bipolar disorder affects her memory; however, she noted that she "worked around" this problem and was able to perform her job duties. (Hood Dep. 43.) While working at ITC, Ms. Hood's bipolar disorder did not affect her ability to care for herself, see, hear, speak, or breathe; however, her medications caused her to experience dizziness, thereby affecting her ability to walk and operate a motor vehicle, and "dry mouth," making it difficult for her to

swallow. Ms. Hood admitted that when she is properly medicated, her ADD does not affect any of her major life activities, and that she was able to work with this condition. While she worked at ITC, Ms. Hood was able to perform all of her major life functions, with the exception of swallowing, while on medication, although she testified that she often suffered from drowsiness that made driving difficult.

B.   Ms. Hood's initial request for an accommodation.

On June 30, 2001, Ms. Hood got up from her work station to get something to drink, and lead operator Lisa Blanton ("Ms. Blanton") told her she was not supposed to be away from her work area other than during scheduled breaks. Ms. Hood told Ms. Blanton that she needed ice for her drink, and that the cafeteria was out of ice. Furthermore, Ms. Hood volunteered to go to a convenience store to purchase ice. Ms. Blanton did not allow Ms. Hood to do so.[2] Ms. Hood explained to Ms. Blanton that she was taking medication that caused her to have a dry mouth; Ms. Blanton told Ms. Hood that she needed to bring a doctor's statement to work to be entitled to refill her drink as needed. The following workday, Ms. Hood spoke to Ms. Keeble and Susan Smith ("Ms. Smith"), another supervisor, about the drink situation. Both supervisors told Ms. Hood that she could take a break to get a drink whenever she needed to, provided

---

[2]While it is clear that ITC's policy did not allow food at workstations, drinks could be kept at employees' desks if they were in approved cups with lids.

that Ms. Hood informed the lead operator that she was refilling her cup when she left the operation center.

Ms. Keeble recommended that Ms. Hood see an Employee Assistance Plan ("EAP") counselor. Without checking with any supervisors regarding her work schedule, Ms. Hood arranged an appointment with an EAP counselor on July 19, 2001 – a day that she was already scheduled to work. Ms. Hood was informed that she could not attend the appointment on that particular day, because it conflicted with her work schedule, but Ms. Hood claims ITC should have let her go to the appointment on that day without regard to her work schedule. Ms. Hood rescheduled this appointment for July 26, 2001, and she was able to meet with a counselor on that date.

On July 22, 2001, Ms. Hood told Ms. Blanton that she needed to refill her drink. Ms. Blanton asked if Ms. Hood had a written statement giving her permission to do so, and because Ms. Hood did not, Ms. Blanton denied her request. On July 25, 2001, Ms. Hood met with Steve Furtick ("Mr. Furtick"), the Vice President of Operator Services, who requested documentation of Ms. Hood's condition from her psychiatrist. Mr. Furtick agreed to accept documentation from Ms. Hood's therapist because the psychiatrist could not be reached. In the meantime, until the note was received, Mr. Furtick told Ms. Hood that she would be allowed to take a break and get a drink whenever necessary; he issued a directive to that effect that day. Ms. Hood concedes that after her meeting with Mr. Furtick, she was

in fact allowed to get a drink as often as was necessary. She eventually provided a letter from her therapist to ITC, which stated that she was "taking medications that may cause dry mouth" and asked that her supervisors "assist with accommodating her need for additional fluids for this condition." (Hood Dep. Ex. 18.)

    C.   Ms. Hood's suspension.

On August 30, 2001, Ms. Hood became very emotional at work and was crying because she felt that nobody cared about her mental illness. Chuck LaPaglia ("Mr. LaPaglia"), the Call Center Manager, was "very nice" to Ms. Hood and tried to calm her down. (Hood Dep. 115.) He told her that her emotional state did not lend itself to continued work, and he instructed her to go home and to call in each day to see whether she could return to work yet. Ms. Hood was ultimately suspended for six days with pay at this time as a result of the August 30, 2001, emotional outburst.

    D.   Further accommodations.

Ms. Hood returned to work on September 6, 2001; on that date, ITC provided her with a letter asking her to identify specific accommodations she sought. In response, Ms. Hood's therapist wrote a letter identifying her disability as bipolar disorder, and requesting the following specific accommodations: access to fluids, time off for scheduled psychiatric and psychotherapy appointments, and the ability to call mental health professionals while at work as needed. Ms. Hood testified that she was unsatisfied with her

counselor's requested accommodations because she believes he should have asked ITC to allow her to come in late when her medications caused her to oversleep or to be too dizzy to safely operate a motor vehicle.

ITC acknowledged receipt of the requested accommodations in a letter to Ms. Hood, which confirmed the company's previous interim accommodation of allowing her access to fluids. It also granted time off for scheduled appointments where such requests were made before the work schedule was published. Finally, the letter allowed her to make telephone calls to mental health professionals during her breaks, but in the case of an emergency, she could call during non-break times.

    E.    Ms. Hood's tardiness and attendance problems.

Ms. Hood admits that during her employment with ITC, she had a problem with tardiness; she was tardy numerous times in 2000 and 2001. Ms. Hood does not recall ever asking ITC for any accommodation for her tardiness; however, Ms. Hood claims ITC should have accommodated her tardiness, because she was on medication, by "look[ing] the other way." (Hood Dep. 67.) Ms. Hood also wanted ITC to "look the other way" when she "no-showed" for work because she overslept and was too drowsy or too dizzy to drive to work.[3] Ms. Hood's affidavit indicates that on October 10, 2001,

---

[3]Ms. Hood acknowledges that she knew she was required by company policy to call at least one hour prior to the start of her shift if she was unable to come to work.

she met with Anthony Whitely, the Human Resources Manager, and Mr. Furtick, about her work schedule, and she was denied a schedule request at that time.[4] She asked Mr. Furtick if the denial of the schedule request had anything to do with her disability and requests for accommodation; she claims that Mr. Furtick said he was tired of hearing about her disability and requests for accommodations.

    F.    Alleged harassment.

Ms. Hood contends she was harassed by ITC in several ways on account of her disability. One example Ms. Hood provided was an instance in which Ms. Blanton walked by Ms. Hood's workstation and instructed her to put a package of pills away. Ms. Hood contends that Ms. Blanton's refusal to allow her to fill her cup, described above, also constituted harassment. Ms. Hood alleges that she was harassed when she was not allowed to see an EAP counselor on July 19, 2001, due to a conflict with her work schedule.

Ms. Hood also claims that she suffered harassment when she found a piece of paper containing private information related to her mental condition in the company's parking lot. Ms. Hood blames management for allowing an important piece of confidential paperwork to end up in the parking lot. Ms. Hood alleges that she was harassed when her calls were monitored six times, rather than the usual five times, in August 2001. However, Ms. Hood does not

---

[4]Ms. Hood does not explain what this schedule request was; nor does her deposition testimony support the conclusion that this exchange occurred.

know whether she was singled out to be monitored six times, or if anyone else was monitored six times. Finally, Ms. Hood claims that she was harassed when some unknown person threw her keys in the trash, and another unknown person took documents out of her calendar.

G.   Ms. Hood's termination.

On January 26, 2001, Ms. Hood received and signed a written warning for having eight occurrences of tardiness totaling one hour and forty-one minutes. Ms. Hood believes this warning was purged when "everybody's" attendance records were purged. (Hood. Dep. 146.) On July 16, 2001, Ms. Hood signed two written warnings for no-call/no-show violations, which she admits did occur. She alleges that she was unable to go to work on those occasions due to her medication. On July 19, 2001, Ms. Hood received and signed a written warning for having seven occurrences of tardiness totaling two hours and nine minutes. On August 29, 2001, Ms. Hood received and signed a written warning for having four absences during a two month period. On August 30, 2001, Ms. Hood received and signed a written warning for a no-call/no-show that occurred on August 24, 2001. Ms. Hood admits that this was the third no-call/no-show write-up she had during a twelve-month period of time; she also acknowledges that she could have been terminated pursuant to company policy for three such write-ups.

On September 21, 2001, Ms. Hood received and signed a written warning for a policy violation and insubordination arising out of Ms. Hood's failure to release an emergency call to the lead operator in violation of company emergency call procedure, which required operators to release emergency calls to the lead operator. However, Ms. Hood claims that the reason for her failure to release the call was that she was told by lead operator Tonya Curtis not to release the call. On October 3, 2001, Ms. Hood received and signed a written warning for attendance arising out of an incident where she left work early on September 28, 2001, with more than one-half of her shift remaining. Ms. Hood explained that she left that day because she experienced demanding feelings of panic.

ITC policy, effective July 2001, stated that any combination of warnings totaling five within a twelve-month period would result in termination. Moreover, three attendance warnings or three no-call/no-show warnings during a twelve-month period would also result in termination. On October 19, 2001, because Ms. Hood had received and signed five written warnings, a recommendation for termination was drafted pursuant to ITC policy. Ms. Hood was terminated on October 24, 2001. Numerous other employees have been terminated for receiving five written warnings, both before and after Ms. Hood's termination.

H.    Procedural history.

Ms. Hood filed a charge of discrimination with the EEOC on November 9, 2001, alleging discrimination on the basis of a disability. She received her notice of right to sue sometime after May 1, 2002, and she filed the instant action on July 25, 2002. [Doc. # 1, Compl.] Ms. Hood states five claims in her complaint: (1) a claim alleging that she was wrongfully terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 ("ADA"); (2) a claim under the ADA alleging that ITC failed to provide a reasonable accommodation; (3) a claim alleging she was subjected to a hostile environment on the basis of her disability in violation of the ADA; (4) a claim of interference with protected rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654; and (5) an FLMA claim alleging retaliatory discharge. ITC filed the instant motion for summary judgment on all claims on June 2, 2003, alleging the absence of any genuine issue of material fact.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   DISCUSSION.

A.   ADA claims.

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) she is disabled, as that term is defined in the ADA; (2) she was a "qualified individual" at the relevant time, meaning she could perform the essential functions of the job in question with or without reasonable accommodations; and (3) she was discriminated against because of her disability. *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). Thus, to be entitled to any protection under the ADA, the plaintiff must first establish that she is disabled within the meaning of the Act.

A person is disabled, for purposes of the ADA, if she:

(A)   [has]   a   physical   or   mental   impairment   that substantially   limits   one   or   more   of   the   major   life activities of such individual;
(B) [has] a record of such impairment; or
(C) [is] regarded as having such an impairment.

42 U.S.C. § 12101(2). Ms. Hood seems to allege in her complaint that she is disabled under all three of the alternate statutory definitions of that term;[5] as such, the court will analyze whether

---

[5]Although her complaint alleges that she has an impairment that substantially limits her ability to perform one or more major life activities, has a record of such an impairment, and was regarded as having such an impairment, Ms. Hood's brief in opposition to the motion for summary judgment states only, in a rather conclusory fashion, that "she has multiple disabilities. Ms. Hood suffers from bi-polar disorder and attention deficit disorder." [Doc. # 45.] However, in an abundance of

Ms. Hood has raised a genuine issue of material fact as to whether she is disabled under each of the three alternate definitions.

      1.    Substantially limiting impairment.

The court acknowledges that Ms. Hood suffers from mental impairments in the form of bipolar disorder and ADD. However, the presence of a mental impairment, standing alone, is not necessarily a disability as defined by the ADA. *Gordon v. E. L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Ms. Hood must offer evidence from which a reasonable factfinder could conclude that her impairments substantially limited one or more of her major life activities to survive the instant motion for summary judgment. *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996). Regulations promulgated by the EEOC define major life activites as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(j). A major life activity is substantially limited when the plaintiff is (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner, or duration under which she can perform a particular major life activity as compared to the condition,

---

caution, the court will address all three methods of establishing a disability within the meaning of the ADA.

manner, or duration under which the average person in the general population can perform that same activity. *Id*.

Courts consider three factors in determining whether a particular impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact of or resulting from the impairment. *Gordon*, 100 F.3d at 911. Additionally, the Supreme Court has instructed courts to consider the effects, both positive and negative, of mitigating measures such as medication when determining whether an impairment substantially limits one or more major life activities. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). The Supreme Court has recently clarified the meaning of "substantially limited," stating that "to be substantially limited in [a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).

Ms. Hood avers that she is substantially limited in the major life activities of swallowing and driving. Assuming that swallowing and driving are major life activities, the court is of the opinion that Ms. Hood has produced no evidence to suggest that she is substantially limited in her ability to swallow or to drive. With respect to swallowing, the court notes that Ms. Hood rectifies this

situation, which is a side effect of her medication, by drinking
fluids throughout the day. There is simply no evidence in the
record from which a reasonable factfinder could conclude that she
is prevented or severely restricted from swallowing.

The same is true as to her allegation that she is
substantially limited in her ability to drive. Ms. Hood claims that
occasionally, her medication causes her to be very drowsy, and she
feels incapable of safely driving at those times. However, this
testimony does not establish that Ms. Hood was prevented from
driving or was severely restricted in her ability to drive; rather,
Ms. Hood's testimony establishes that she occasionally was unable
to drive due to adverse side effects of her medication.  While this
negative effect of her medication is to be considered, such proof
falls well short of what is required to find substantial
limitations in her ability to perform a major life function. As
such, Ms. Hood has not adduced sufficient evidence to enable a
reasonable factfinder to conclude that she is disabled under the
first statutory definition of that term.

2.    Record of such an impairment.

An individual can be disabled for purposes of the ADA if she
has a record of an impairment that substantially limits a major
life activity. This standard is satisfied only if the plaintiff
actually suffered an impairment that substantially limited a major

life activity. *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999).

Ms. Hood seems to allege that she had a record of an impairment because she notified ITC that she suffered from bipolar disorder and ADD; however, the court is of the opinion that "this is insufficient to establish that a record of impairment exists, especially when this [c]ourt has already found that [Ms. Hood's] impairments [themselves are] not legally disabling." *Ross v. GTE Directories Corp.*, 73 F. Supp. 2d 1342, 1349 (M.D. Fla. 1999). *See, e.g., EEOC v. R. J. Gallagher Co.*, 181 F.3d 645, 655 (5th Cir. 1999) (it is not enough to show a record of diagnosis; there must be a record of impairment that substantially limits one or more major life activities); *Gutridge v. Clure*, 153 F.3d 898, 901 (8th Cir. 1998) (multiple hospitalizations plus medication, work restrictions, and inability to perform manual tasks did not create a record of substantially limiting impairment); *Burch v. Coca Cola Co.*, 119 F.3d 305, 317 (5th Cir. 1997) (a record of hospitalization, without a finding of actual substantial limitation, does not suffice to demonstrate a record of disability); *Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 953 (3d Cir. 1996) (a diagnosis alone is insufficient; the plaintiff must show that the diagnosed impairment substantially limited a major life activity). Because Ms. Hood's documentation of her impairment reflects nothing more than a diagnosis, and the company was not

aware of any substantially limiting impairment, Ms. Hood cannot satisfy the record-of-impairment definition of disability.

     3.   Regarded as having such an impairment.

Finally, Ms. Hood alleges that ITC regarded her as having a substantially limiting impairment. There are two ways in which an individual may fall within this definition of disabled: (1) the employer mistakenly believes that the employee has an impairment that substantially limits one or more major life activities, or (2) the employer mistakenly believes that the employee's actual, nonlimiting impairment substantially limits one or more major life activities. *Hilburn*, 181 F.3d at 1230. In either case, the employee must establish that the employer viewed her as having a substantially limiting impairment. *Gordon*, 100 F.3d at 913.

Ms. Hood has presented no evidence that ITC perceived her as disabled in any life activity. The fact that ITC had knowledge of her diagnosis, standing alone, does not establish that it perceived her as substantially limited. *Blackston v. Warner-Lambert Co.*, CV-98-P-2974-S, 2000 WL122109, at *4-*5 (N.D. Ala. Jan. 26, 2000), *aff'd* 228 F.3d 418 (11th Cir. 2000). There is simply no evidence to suggest that ITC entertained a misperception about Ms. Hood's mental impairment, or that it believed Ms. Hood was substantially limited in any major life activity. The "mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled, or that

such a perception caused [an] adverse employment action." *Kelly v.
Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996). Thus, Ms. Hood
cannot establish that she was perceived as disabled under the ADA.

Because Ms. Hood has failed to adduce sufficient evidence from
which a reasonable factfinder could conclude that she is disabled
within the meaning of the ADA, she is not entitled to the
protection of the ADA. The court need not, therefore, analyze
whether Ms. Hood can establish any of the other elements of a prima
facie case under the ADA. Summary judgment is due to be granted as
to all Ms. Hood's ADA claims.

    B.   FMLA claims.

The FMLA entitles an eligible employee to, inter alia, twelve
workweeks of leave during any twelve-month period "because of a
serious health condition that makes the employee unable to perform
the functions of the position of such employee." 29 U.S.C. § 2612.
A "serious health condition" is defined under the FMLA as "an
illness, injury, impairment, or physical or mental condition that
involves – (A) inpatient care in a hospital, hospice, or
residential medical care facility; or (B) continuing treatment by
a health care provider." 29 U.S.C. § 2611(11).

To secure the rights provided by the FMLA, the Act creates two
types of claims aggrieved employees may bring against employers
alleged to be in violation of the Act: interference claims, in
which employees assert that their employers denied or otherwise

interfered with their rights under the Act, and retaliation claims, in which employees assert that their employers discriminated against them because they engaged in activity protected by the Act. *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Ms. Hood states both an interference and a retaliation claim; the court will address each in turn.

> 1.   Interference.

To state a claim of interference under the FMLA, "an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to [a] benefit denied." *Strickland*, 239 F.3d at 1207. However, the record contains no evidence establishing that Ms. Hood was suffering from a "serious health condition" as defined by the FMLA on the occasion of any of her absences from work. *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) ("[N]ot all leave requested or taken for medical reasons qualifies for the FMLA's protections. For this reason, employers have a statutory right to require an employee requesting FMLA leave to obtain certification that attests to the employee's eligibility for such leave from a health care provider."). Additionally, Ms. Hood never requested FMLA leave or gave ITC sufficient information to place the company on notice that she might be suffering from a covered serious health condition.

Where the need for FMLA leave is foreseeable, the Act requires an employee to "provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave." 29 U.S.C. § 2612(e)(2)(B). If advance notice is impossible because the need for leave is unforseeable, an employee should give notice to the employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303. Because Ms. Hood has produced no evidence to suggest that she provided ITC with information sufficient to put the company on notice that she needed FMLA leave, or to suggest that she was actually entitled to such leave due to a "serious health condition that ma[de her] unable to perform the functions of [her] position," 29 U.S.C. § 2612, her claim for denial of leave must fail as a matter of law. Summary judgment as to this claim will be granted.

    2.   Retaliation.

To succeed on an FMLA retaliation claim, "an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207. Because Ms. Hood has produced no direct evidence of discriminatory intent,[6] her

---

[6]Direct evidence of discriminatory or retaliatory intent is evidence that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997). For instance, a statement by the decision-maker that Ms. Hood was being fired for applying for FMLA leave would qualify as direct evidence of retaliatory intent. Ms. Hood alleges that Mr. Furtick's remark that he was tired of hearing about her disability and her requests for accommodation constitutes direct

FMLA retaliation claim proceeds under a burden-shifting analysis. To state a prima facie case of retaliation, Ms. Hood must allege that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the decision was causally related to the protected activity. *Id.* As with Title VII retaliation claims, if Ms. Hood establishes a prima facie case of retaliation, ITC has the burden of articulating a legitimate, nondiscriminatory reason for the adverse action, and Ms. Hood is left with the ultimate burden of proving that the reason or reasons articulated by ITC are mere pretext for retaliation. *Cf. Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000).

The court is not satisfied that Ms. Hood has presented evidence sufficient to state a prima facie case and to thereby raise an inference of retaliatory intent. Although Ms. Hood was terminated from her employment in October 2001, thus establishing the second element of the prima facie case, there is no evidence to suggest that Ms. Hood engaged in some statutorily protected activity that resulted in her termination. Specifically, there is no evidence in the record to suggest that Ms. Hood applied for FMLA leave with respect to any of her absences, and, as the court has already concluded, there is no evidence to support a conclusion that her absences would have qualified for FMLA leave in any event.

---

evidence of retaliatory intent. However, the court is of the opinion that this statement is not the kind of "blatant remark[ ]", whose intent could be nothing other than to [retaliate]" that qualifies as direct evidence. *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Having failed to establish that she asked for and/or was entitled to FMLA leave, Ms. Hood cannot establish that she engaged in some statutorily protected activity, nor can she establish a causal connection between any protected activity and her ultimate termination. *See Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) ("Because the evidence is unrefuted that . . . the decision maker . . . did not know [the plaintiff] had requested . . . medical leave, [the plaintiff] failed to create a genuine issue of fact as to a causal connection between her termination and her . . . request for [leave]. Accordingly, she failed to establish a prima facie case of retaliation under the FMLA."). Because Ms. Hood cannot establish a prima facie case of retaliation under the FMLA, summary judgment as to that claim is due to be granted.

V.   CONCLUSION.

In sum, the court is of the opinion that the motion for summary judgment is due to be granted in all respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___22nd___ of July, 2003.


_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\CLERK2\Danielle\Memoranda\DISCRIMINATION CASES\Disability\Hood v. ITC, CV-02-CO-1842-E, summary judgment opinion disability and FMLA.wpd